IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GREGORY COOPER,<br>an individual, | ) ) ) | |
| | ) | 8:14CV271 |
| Plaintiff, | ) ) | |
| v. | ) ) | **MEMORANDUM**<br>**AND ORDER** |
| PENSKE TRUCK LEASING, CO.,<br>LTD PARTNERSHIP, | ) ) ) | |
| Defendant. | ) ) ) | |

Plaintiff Gregory Cooper claims he was discriminated against and harassed based on his race[1] during his employment with Penske Truck Leasing, in violation of Title VII and the Nebraska Fair Employment Practices Act.[2] Defendant Penske has filed a motion for summary judgment. (Filing 21.)

## I.  UNDISPUTED MATERIAL FACTS

1.      Plaintiff Cooper started working as a technician at Penske's facility in

---

[1]Pursuant to the parties' stipulation, Cooper's third cause of action for retaliation was previously dismissed with prejudice. (Filing 20.)

[2]*See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101 to 48-1125. Both the Nebraska Supreme Court and the Eighth Circuit Court of Appeals have stated that the NFEPA "'is patterned after Title VII,' and, therefore, 'it is appropriate to consider federal court decisions construing the federal legislation' when considering questions under the NFEPA." *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005) (quoting *City of Fort Calhoun v. Collins*, 500 N.W.2d 822, 825 (Neb. 1993); citing *Orr v. Wal–Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002)).

Omaha, Nebraska, in November 2011. (Filing 1, Pl.'s Complaint ¶ 1.)

2.      Cooper is African-American. (Filing 1, Pl.'s Complaint ¶ 1.)

3.      Cooper always worked the 7:00 a.m. to 3:30 p.m. ("early" or "day") shift while employed at Penske. (Filing 27-3, Dep. of Gregory Cooper ("Cooper Dep.") 80:15-19.)

4.      Cooper's coworker, Aaron Poteet, told Cooper that other Penske employees were complaining about Cooper's skill level and making "racist comments" about Cooper "every single day," but Cooper did not personally hear any racial comments from other Penske employees. (Filing 27-3, Cooper Dep. 32:12-15, 131:16-132:5.) Cooper thinks racial comments about him were "more hidden between the guys in a private conversation" and were "always done behind [his] back" and "[n]ever to [his] face." (Filing 27-3, Cooper Dep. 31:16-21, 60:7-19.)[3] Cooper never complained to management about any race- or color-based comments prior to October 2013. (Filing 27-3, Cooper Dep. 32:16-21.)

5.      On October 6, 2013, during an evening-shift break, the evening shift lead technician Michael Wortman, Poteet, and a couple of other technicians were engaged in a conversation. At one point in the conversation, Wortman said that he wanted to call Cooper a "nigger" (or words to that effect) for a long time, but did not do so

---

[3]Plaintiff's counsel seeks to "dispute" this fact with Cooper's testimony that "it all makes perfect sense if—if you listen to the recording, everything's in there from the day I started all the way up to 2013, October 6, it made everything clear to me that these guys hated me because of my skill level and my color which is I'm African American." (Filing 27, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at CM/ECF p. 2; Cooper Dep. 31:10-15.) This vague testimony regarding an audio recording that is not before the court does not contradict Cooper's repeated statements that he did not personally hear any racial comments about him. (Filing 27-3, Cooper Dep. 31:16-21, 32:12-15, 60:7-19.)

because he would be disciplined. (Filing 27-5, Dep. of Aaron Poteet ("Poteet Dep.") 11:8-12:1.)[4] Wortman's racially-charged comment about Cooper was not said directly to Cooper or in his presence. (Filing 27-3, Cooper Dep. 60:13-19; Filing 27-5, Poteet Dep. 25:14-19.)

6.      Unbeknownst to Wortman, Poteet recorded the October 6, 2013, conversation he had with Wortman. (Filing 27-5, Poteet Dep. 11:8-18, 12:2-4.)

7.      On October 8, 2013, Poteet informed Maintenance Supervisor Paul Harden about the substance of the October 6, 2013, conversation, including Wortman's racial comment about Cooper. (Filing 27-3, Cooper Dep. 53:3-20; Filing 27-5, Poteet Dep. 15:18-23, 16:23-17:3.)

8.      Poteet complained to Harden about Wortman's offensive and derogatory language about Poteet's "bloodline," as well as the derogatory comment Wortman made regarding Plaintiff. (Filing 27-4, Dep. of Paul Harden ("Harden Dep.") 59:10-21; Filing 27-5, Poteet Dep. 13:5-10, 15:18-23; Filing 27-3, Cooper Dep. 89:4-9.)

9.      After Poteet complained to Harden about Wortman's October 6, 2013, comments, Cooper played the audio recording of the October 6 conversation for Harden within the same 24 hours. (Filing 27-4, Harden Dep. 46:16-20.)

10.     Poteet was the only Penske employee who told Cooper that Wortman had made a racist comment about him. (Filing 27-3, Cooper Dep. 131:16-20.)

11.     On October 8, 2013, Maintenance Supervisor Harden held a mandatory meeting with all technicians at the Penske facility. The purpose of the mandatory

---

[4]Again, Plaintiff's counsel "disputes" this fact with deposition testimony from Poteet that does not contradict any part of this fact. (Filing 27, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at CM/ECF p. 2.)

meeting was to review Penske's anti-harassment policy. (Filing 27-3, Cooper Dep. 39:1-14; Filing 27-5, Poteet Dep. 15:18-16:13.)

12.     At the meeting, Harden went over the policy, handed each technician a copy of the policy, and had each technician sign the policy and agree to follow it. (Filing 27-3, Cooper Dep. 39:1-23; Filing 27-5, Poteet Dep. 15:18-16:22.) Until the October 8, 2013, meeting, Cooper did not know that Penske had an anti-harassment policy and "who was the chain of command" because Penske did not provide him with a "proper orientation." Penske also failed to provide Cooper with a standard-issue uniform for his first several weeks of employment. Instead, Penske gave him a fluorescent shirt, about which his coworkers ridiculed him on a daily basis. (Filing 27-3, Cooper Dep. 40:1-15.)

13.     On October 10, 2013, District Manager Tom Leto and Maintenance Supervisor Harden held a mandatory technician meeting at the Omaha facility to discuss the derogatory language that Wortman used on October 6, 2013. (Filing 27-3, Cooper Dep. 43:6-18.)

14.     The purpose of the October 10, 2013, mandatory meeting was to discuss the anti-harassment policy and to reinforce what Harden had said two days earlier at the prior meeting. (Filing 27-3, Cooper Dep. 50:23-51:13.)

15.     The men that led the October 10, 2013, meeting communicated that anyone who violated the anti-harassment policy would be disciplined. (Filing 27-3, Cooper Dep. 51:19-52:5.)[5]

---

[5]Plaintiff's counsel again seeks to "dispute" this fact with testimony that does not do so—that is, that Cooper met with Rich Papp, the Service Manager at Penske's J Street location in Omaha, and with Harden, but neither man seemed to "really care[]" or show "concern." (Filing 27-3, Cooper Dep. 42:4-43:24.) *See* NECivR 56.1(b)(1) (response to movant's statement of material facts shall consist of specifically cited materials that correspond to each paragraph of "the movant's statement of material

16. District Manager Tom Leto told Cooper on October 10, 2013, that Wortman had been written-up, demoted, and his pay had been reduced $1.00 per hour because he violated Penske's anti-harassment policy on October 6, 2013. (Filing 27-3, Cooper Dep. 70:8-71:17.) Cooper is "not sure" if these actions were actually taken because he did not see the write-up or Wortman's paycheck, and Wortman appeared to be "still . . . in charge" after that date because Wortman retained his company credit card, which was used by employees in "lead tech" positions. (Filing 27-3, Cooper Dep. 71:3-72:24.)

17. From July 2012 forward, Wortman always worked the second technician shift, which started at 3:00 p.m. and ended at 11:30 p.m., while Cooper worked the 7:00 a.m. to 3:30 p.m. shift. (Filing 27-3, Cooper Dep. 80:20-81:2.) Cooper and Wortman had very little interaction at work because they worked on opposite shifts, and the overlap of the two shifts was only 30 minutes on any given day. (Filing 27-5, Poteet Dep. 8:12-24, 10:8-11; Filing 27-4, Harden Dep. 61:16-62:9.) Penske management did not move Wortman from the day shift to the night shift because Cooper objected. (Filing 27-3, Cooper Dep. 76:16-78:12.)

18. During Cooper's employment at Penske, Maintenance Supervisor Harden asked both Cooper and Jordan Sterba, a Caucasian, to attend a "Freightliner" training class, but there was only one open spot left in the class. Sterba got the last remaining spot in the class, and Cooper was wait-listed. (Filing 27-4, Harden Dep. 62:16-25.) Cooper thinks the class actually "wasn't full," and that Harden "just didn't want [him] to go" because Harden "had the same hate for [him] as Mike Wortman did." (Filing 27-3, Cooper Dep. 74:15-75:24.) Cooper "know[s] no one was certified in Freightliner but [him]—or needed that class to have [his] certification complete but [him]." (Filing 27-3, Cooper Dep. 80:2-4.)

---

facts that is <u>disputed</u>. *Properly referenced material facts in the movant's statement are considered admitted unless <u>controverted</u> in the opposing party's response*") (italics in original; underlining added).

19.     Cooper did not talk to technician Jordan Sterba or anyone else about why Sterba was allowed to attend the training class instead of Cooper because he "didn't know who to complain to. Like I told you before, I didn't know who was director of H.R., I was, like I said, my orientation was, Hey go to work, . . . so I wasn't properly trained from the get-go." (Filing 27-3, Cooper Dep. 74:19-75:17, 84:23-85:5, 99:15-100:6.) Cooper testified that even if he had complained, "It didn't matter what I said. [Paul Harden] lied to me anyway. The class wasn't full so why would I talk to him?" (Filing 27-3, Cooper Dep. 75:9-19.)

20.     Jordan Sterba did not have as much skill and training as other technicians, but he was "forced" to be a lead technician for a short period of time after Wortman was demoted. (Filing 27-3, Cooper Dep. 100:7-16.) During the same time frame, Cooper acted as the lead technician for at least one day, and he was able to stop a fight between Poteet and another coworker during that shift. (Filing 27-3, Cooper Dep. 100:16-102:15.) Penske's new human resources representative, Graylin Smith, thanked Cooper for stopping the escalation, but then bypassed Cooper and promoted Matt Shaw, a Caucasian, to the position of lead technician. (Filing 27-3, Cooper Dep. 101:15-102:19.)

21.     Penske's lead technicians distribute work, but do not have any supervisory responsibilities. (Filing 27-4, Harden Dep. 11:8-12:1.)

22.     While employed at Penske, Cooper always received a raise on his annual start date. (Filing 27-3, Cooper Dep. 110:6-13, 122:3-14.)

23.     After October 2013, no Penske employee made a racially-charged comment to Cooper or in his presence because, Cooper believed, his coworkers knew there was a no-tolerance policy and that they would be fired for making such a comment. (Filing 27-3, Cooper Dep. 113:25-114:15; Filing 27-5, Poteet Dep. 25:14-19; Filing 27-4, Harden Dep. 61:4-15.)  However, Cooper believed that after October 2013, "things started to be said of me being a thief.  Mike [Wortman] started

up again after a little while . . . he started saying things again behind my back." (Filing 27-3, Cooper Dep. 114:16-115:7.)

24.     Cooper gave his two-week notice to Penske on September 1, 2014, in order to begin work for Ryder Trucking Company, where he makes more money and receives better benefits. (Filing 27-3, Cooper Dep. 106:12-22, 108:2-7, 148:20-149:2.)

## II.  STANDARD OF REVIEW

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Rynders v. Williams*, 650 F.3d 1188, 1194 (8th Cir. 2011) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

"'Summary judgment is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim.'" *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1130 (8th Cir. 2014) (quoting *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1032 (8th Cir. 2012)).  *See also Walz v. Ameriprise Financial, Inc.*, 779 F.3d 842, 847 (8th Cir. 2015) (affirming grant of summary judgment in favor of employer when plaintiff-employee failed to make a prima facie showing of element of ADA claim); *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) ("the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial").

## III.  DISCUSSION

Plaintiff Cooper alleges that his employer discriminated against him and

harassed him based on his race because Penske failed to provide Cooper with job orientation, access to information regarding the chain of command, copies of harassment and other human-resource policies, the standard-issue uniform, and training for which he was "wait-listed" but which was attended by a Caucasian male employee. (Filing 27-3, Cooper Dep. 40:1-15, 74:15-75:8.) Cooper also bases his claims on a racial comment made by coworker Michael Wortman.

## A. Discrimination Based on Race

When there is no direct evidence of racial discrimination, the court must apply the *McDonnell Douglas* burden-shifting framework to determine whether Cooper has established a prima facie case of employment discrimination. *Xuan Huynh v. United States Dep't of Transp.*, 794 F.3d 952, 958 (8th Cir. 2015). First, Cooper must show that "(1) he was a member of a protected group; (2) he was qualified to perform the job; (3) he suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Id.* If the plaintiff establishes this prima facie case of discrimination, a "presumption of unlawful discrimination" arises, and the burden of proof shifts to the employer to "present evidence of a legitimate, nondiscriminatory reason for its adverse employment action." *Id.* (quotation marks and citation omitted). If the employer can "articulate a nondiscriminatory reason, the burden returns to the employee to prove that the proffered reason is pretextual." *Id.* (quotation marks and citation omitted).

The defendant does not dispute that Cooper was a member of a protected group and that he was qualified to perform the job. (Filing 23, Def.'s Br. Supp. Mot. Summ. J. at CM/ECF p. 15.) However, there is no evidence whatsoever that Cooper suffered an adverse employment action as a result of the alleged discrimination. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects." *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015) (quotation marks and citation omitted).

Throughout his employment at Penske, Cooper received annual raises and worked the more desirable daytime shift. Cooper never experienced an unfavorable change in position or job duties, decrease in pay or benefits, suspension, or termination—to the contrary, he voluntarily left Penske for a job that offered increased pay and benefits.[6] The fact that Cooper was wait-listed for training while a white employee was allowed to attend the same training, without more, is not an adverse employment action. "[T]here is no indication that the denial of this one training session had any impact on [Cooper's] eligibility for benefits such as a promotion or pay raise." *Clegg v. Arkansas Dep't of Correction*, 496 F.3d 922, 928 (8th Cir. 2007); *see also Box v. Principi*, 442 F.3d 692, 697 (8th Cir. 2006) ("'[a]n employer's denial of an employee's request for training is not, without more, an adverse employment action.'" (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 737 (8th Cir. 2004)).

Penske's other alleged discriminatory actions—failure to provide Cooper with job orientation, information regarding the chain of command, copies of harassment and other human-resource policies, and the standard-issue uniform—do not "show the level of systematic bad treatment adversely affecting [Cooper's] employment situation" necessary to be fairly characterized as "a material employment disadvantage" to Cooper. *Clegg*, 496 F.3d at 927-28; *see also Box*, 442 F.3d at 697 (denial of annual leave and failure to provide job description to plaintiff "fall short of showing an adverse employment action" because neither action caused plaintiff to "suffer a material change in employment resulting in an adverse employment action").

Because the plaintiff has failed to establish a prima facie case of racial discrimination, the defendant's motion for summary judgment must be granted on this claim.

---

[6]Cooper does not assert a constructive discharge claim. *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 753 (8th Cir. 2000) (constructive discharge occurs "when an employer deliberately makes an employee's work environment so intolerable that resignation is the employee's only plausible alternative").

## B.  Harassment/Hostile Work Environment Based on Race

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotations and citation omitted). To prove that racial harassment by a non-supervisory coworker [7] like Wortman has created a hostile work environment in violation of Title VII, Cooper must prove the following five elements:

---

[7]There is some suggestion in the depositions filed by the parties that as a "lead tech," Wortman was a supervisor, not simply Cooper's coworker. However, possession of a company credit card and ability to assign work do not make Wortman a "supervisor" for purposes of Title VII liability. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 24443 (2013) ("an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" (quotation marks and citation omitted)); *E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 685 (8th Cir. 2012) ("a coworker's authority to make mere *recommendations* or evaluations to a superior about tangible employment decisions pertaining to a fellow employee does not constructively promote that coworker to a supervisor for purposes of vicarious Title VII liability"); *see, e.g., Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 851 (8th Cir. 2005) (holding that a harassing foreman was merely his victim's coworker, and not the victim's supervisor, because the foreman's own supervisor possessed the authority to hire, fire, and promote the laborers, and "although [the foreman's supervisor] may have consulted with [the harassing foreman] on such matters, the record [was] clear that [the harassing foreman] lacked any such authority"); *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004) ("While it is true that [the alleged harasser] signed at least three of [the plaintiff's] initial performance evaluations and that [the supervisor] acknowledged that he had based his decision to terminate [the plaintiff] at least in part on [the plaintiff's] job[-]evaluation scores, [the alleged harasser] himself did not have the authority to take tangible employment action against [the plaintiff].").

"(1) he is a member of a protected class; (2) unwelcome harassment occurred; (3) there is a causal nexus between the harassment and his protected-group status; (4) the harassment affected a term, condition, or privilege of his employment; and (5) [the employer] knew or should have known of the harassment and failed to take prompt and effective remedial action." *Robinson v. Valmont Ind.*, 238 F.3d 1045, 1047 (8th Cir. 2001).

*Jackman v. Fifth Judicial Dist. Dept. of Correctional Svs.*, 728 F.3d 800, 805-06 (8th Cir. 2013) (some brackets removed); *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010) (employer cannot be vicariously liable for harassment by non-supervisory coworkers unless employer knows or should have known of harassment and employer failed to take immediate and appropriate corrective action).[8]

"The standard for demonstrating a hostile work environment under Title VII is demanding, and does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace." *Jackman*, 728 F.3d at 805-06 (quotation marks and citation omitted).

As to Penske's alleged failure to provide Cooper with orientation, information on the chain of command, copies of harassment and other human-resource policies, the standard-issue uniform, and one training course, I conclude that Cooper has

---

[8]If Wortman was actually Cooper's supervisor, Cooper would only need to establish the first four elements to prove a harassment claim. *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010) (harassment claim requires showing of membership in protected class, unwelcome harassment, causal nexus, and effect on term of employment; if non-supervisory employee was responsible for the harassment, additional fifth element of employer's knowledge and remedial action taken is required); *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518-19 (8th Cir. 2010) (same); *Bogren v. Minnesota*, 236 F.3d 399, 407 n.6 (8th Cir. 2000) ("A plaintiff need not show that her employer failed to take remedial action with knowledge of the harassing conduct if the alleged harassers are supervisory employees.").

established neither a causal nexus between such "harassment" and his race, nor that such harassment affected a term, condition, or privilege of his employment. As to coworker Wortman's racial comment made outside of Cooper's presence, Cooper has failed to establish that the comment affected a term, condition, or privilege of his employment and that Penske failed to take prompt and effective remedial action.

### 1. Causal Nexus Between Harassment and Race

This element would be satisfied if Penske's failures to provide Cooper with various types of information, a uniform, and one training class were "because of" Cooper's race. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010); *Singletary v. Missouri Dept. of Corrections*, 423 F.3d 886, 892 (8th Cir. 2005). Cooper has presented nothing other than his belief that these failures were connected to his race. On summary judgment, "the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473-74 (8th Cir. 2010). Simply alleging a connection to race, without supporting evidence, "is insufficient to create a question of fact." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 888 (8th Cir. 2015) (testimony by former employees that they believed employer fostered "ageist culture" was insufficient to create question of fact for purposes of summary judgment; such testimony fell short because it did not "sufficiently substantiate [the plaintiff's] claims with probative evidence that would permit a finding in his favor as he must at summary judgment").

Because Cooper has failed to substantiate his allegation that Penske's failure to provide him with information, a uniform, and training was based on Cooper's race, the only remaining conduct at issue is Wortman's racial comment made to Cooper's coworkers.

### 2. Affected Term or Condition of Employment

"[I]n order to find that the harassment affected a term, condition or privilege of

employment, [Cooper] must be able to establish that the conduct was extreme, such that intimidation and ridicule permeated the workplace." *Jackman*, 728 F.3d at 806. The environment must be objectively and subjectively offensive—that is, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Carter v. Chrysler Corp.*, 173 F.3d 693, 701-02 (8th Cir. 1999).

> The standards for a hostile environment are demanding, and conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment. When evaluating a hostile environment, we look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance.

*Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010) (quotation marks and citations omitted).

Wortman's comment that "he wanted to call Cooper a 'nigger' (or words to that effect) for a long time" and his alleged statement that Cooper was a "thief"[9]—comments of which Cooper had only second-hand knowledge—simply do not constitute conduct so severe or pervasive that a reasonable person would consider Cooper's work environment to be hostile or abusive. The comments were isolated, infrequent, and not physically threatening, and there is no evidence that these comments unreasonably interfered with Cooper's work performance. *See Bowen v. Missouri Dep't of Social Services*, 311 F.3d 878, 884-85 (8th Cir. 2002) (specifying factors to be considered in deciding whether work environment is hostile); *see also*

---

[9]Cooper stated in his deposition that after October 2013, he believed that "things started to be said of me being a thief. Mike [Wortman] started up again after a little while . . . he started saying things again behind my back." (Filing 27-3, Cooper Dep. 114:16-115:7.) However, Cooper has not presented evidence supporting his belief.

*Sellers v. Deere & Co.*, 791 F.3d 938, 944 (8th Cir. 2015) (two severe and offensive incidents over four years were "isolated"; other minor incidents like giving plaintiff too much work, barring him from conference room, refusing to put work assignments in writing, wrongly blaming plaintiff for failed audit, and general mistreatment may have been "rude or unpleasant," but were "not severe enough to affect the terms, conditions, or privileges of his employment" (quotation marks and citations omitted)); *Ellis v. Houston*, 742 F.3d 307, 321 (8th Cir. 2014) (pattern of hostile conduct established by looking at all black officers on plaintiff's shift; officers experienced racist remarks on near daily basis in front of entire staff with supervisors actively joining in the "constant refrain of racist jokes"); *Burkett v. Glickman*, 327 F.3d 658, 661-62 (8th Cir. 2003) (no hostile work environment when plaintiff alleged that supervisors made racially prejudicial remarks and coworkers engaged in racially motivated treatment, but failed to present evidence that plaintiff was present during the remarks and the contents of the remarks, and only supporting evidence was that coworker heard the word "nigger" being used in front of "certain . . . . employees"; "Offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment."); *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir. 2002) ("sporadic" racially motivated conduct by coworkers was not severe or pervasive enough to create hostile work environment); *Dowd v. United Steelworkers of America, Local No. 286*, 253 F.3d 1093, 1102 (8th Cir. 2001) (reasonable juror could have found workplace was permeated with discrimination, ridicule, and insult when plaintiffs were subjected to racial slurs, threats of physical violence, and plaintiffs feared for their personal safety).

### 3. Penske's Knowledge and Response

An employer cannot be liable for harassment by a plaintiff's coworker if the employer responds to the harassment "with prompt remedial action calculated to end it." *Alvarez*, 626 F.3d at 421.

Factors in assessing the reasonableness of remedial measures may

include the amount of time that elapsed between the notice and remedial action, the options available to the employer, . . . and whether or not the measures ended the harassment. Employees often must tolerate some delay, however, so that an employer can gauge the credibility of the complainant and the seriousness of the situation.

*Alvarez*, 626 F.3d at 421 (quotation marks and citations omitted).

Here, it is undisputed that the same day Wortman's racial comment was reported to Maintenance Supervisor Paul Harden, he took immediate action. Wortman was immediately written up, demoted, and his pay was reduced. Penske management then conducted a mandatory meeting regarding Penske's anti-harassment policy, and all technicians agreed to abide by it. Two days later, Harden and District Manager Tom Leto convened a second mandatory technician meeting to further enforce the policy. By Cooper's own admission, these remedial measures were effective, as he was unaware of any further comments which were racially based and directed at him after October 8, 2013. Cooper testified that such comments ceased because his coworkers "knew that there was a no[-]tolerance policy and they would be fired." (Filing 27-3, Cooper Dep. 114:10-15.)

I conclude that Penske's actions were "reasonably calculated to stop the harassment," and Penske's response "effectively ended the harassment within a reasonable time." *Alvarez*, 626 F.3d at 421 (quotation marks and citations omitted) (district court properly granted summary judgment in favor of employer on sexual harassment claim because after plaintiff complained to supervisor about physical harassment, management confronted the alleged aggressor, spoke to coworkers, and reported information to upper management, and after written complaint was filed, employer launched investigation, prepared report finding violations of company policy, suspended aggressor without pay for five days, and transferred him to another department, resulting in no further harassment of plaintiff).

**4. Conclusion on Harassment Claim**

Because Cooper has failed to establish specific facts sufficient to raise a genuine issue for trial regarding at least one element for all of the conduct Cooper characterizes as harassment, summary judgment is appropriate on Cooper's harassment claim.

Accordingly,

IT IS ORDERED:

1.    The defendant's motion for summary judgment (Filing 21) is granted; and

2.    Judgment shall be entered by separate document.

DATED this 9th day of November, 2015.

                              BY THE COURT:
                              s/ *Richard G. Kopf*
                              Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.